## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 30 2015, 10:39 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Steven J. Halbert
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

In Re J.H. (Minor Child), Child in Need of Services,

and

E.H. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

October 30, 2015

Court of Appeals Case No.
49A02-1503-JC-158

Appeal from the Marion Superior Court, Juvenile Division

The Honorable Marilyn A. Moores, Judge, and the Honorable Rosanne T. Ang, Magistrate

Trial Court Cause No.
49D09-1406-JC-1275

**Mathias, Judge.**

The Marion Superior Court found J.H. to be a Child in Need of Services ("CHINS"). J.H.'s mother, E.H. ("Mother") appeals this determination and presents two issues, which we restate as: (1) whether the trial court's CHINS finding is supported by sufficient evidence, and (2) whether the trial court's CHINS finding was based on improper grounds.

We affirm.

## Facts and Procedural History

J.H. was born in December 2010 to Mother and J.R. ("Father").[1] J.H. was later diagnosed as being on the autism spectrum. For approximately a year and a half after J.H.'s birth, Mother and J.H. lived with Father in an apartment owned by Mother's parents in Washington, D.C. Mother moved out of this apartment in February 2012 and took J.H. with her. Mother's reason for moving was her belief that Father and her mother ("Grandmother") were too close and had an inappropriate relationship. Mother apparently first moved to another location in Washington, then in October 2012, moved to Maryland. In December 2013, Mother and J.H. began to live in a shelter in Washington and stayed there until January 2013, when they moved to Virginia, where Mother

---

[1] The record appears to still have some uncertainty regarding J.H.'s paternity. Mother initially admitted that J.R. was the child's father, as he is named on the birth certificate as the father. J.R. later signed a paternity affidavit admitting that he was J.H.'s father. During the CHINS proceedings, however, Mother claimed that she was still married to another man at the time of J.H.'s birth. She also claimed that another man was possibly J.H.'s father. At the time of the CHINS dispositional order, the issue of J.H.'s paternity was still unsettled. Thus, J.R. is referred to in the record both as J.H.'s father and alleged father. For purposes of this appeal, in which J.R. does not participate, we will refer to him as J.H.'s father.

worked as a nanny. Then, in February or March of that year, Mother moved to Ohio, again taking J.H. with her. In Ohio, Mother lived in two different cities and initially stayed in a shelter before moving into a hotel and eventually an apartment. During this time, Mother supported herself and J.H. by working as a writer for internet sites and by non-court-ordered "child support" money that Father gave to help provide for J.H.

[4] During this time, Mother believed that Father and Grandmother were harassing her, which she referred to as "abuse." *See, e.g., Tr. p. 13.* Specifically, she claimed that they were attempting to "gaslight" her, which she described as attempting to make her think that she was insane so that she would kill herself.[2] *See id.* at 8, 13, 19, 56-57. Mother also displayed somewhat paranoid behavior, e.g., refusing to provide fingerprints for a job application for fear that Grandmother, a retired CIA analyst, would use her fingerprints to track her. Mother also suspected that Grandmother had infected her computer with spyware because her computer crashed after receiving email from Grandmother.

[5] Spurred by her fear of Father and Grandmother, Mother left Ohio with J.H. briefly for Florida to establish a "confidential" address via a P.O. Box, so that

---

[2] *See Mikkelson v. Shackleton*, 2015 WL 4935632, at *2 (Iowa Ct. App. Aug. 19, 2015) (describing gaslighting as "'methodically providing false information to a person such that the person doubts his or her own perception and memory.' The term comes from the 1938 play *Gas Light* (also known as *Angel Street* ) by Patrick Hamilton."); *Coburn v. Moreland*, 433 S.W.3d 809, 818 (Tex. App. 2014) (describing gaslighting as "manipulative behavior used to confuse people into questioning their reactions to events, so much so that the victims of gaslighting begin to question their own sanity.").

Grandmother and Father could not locate her. *Id.* at 8. Mother and J.H. then came to Indiana, where she planned to stay temporarily before moving back to Florida. While Mother was in Indiana, her car broke down, and she was homeless. She eventually found shelter at the home of someone she met through a local church. Since this arrangement was not permanent, she went to a shelter after a few weeks. However, Mother was concerned that her family would be able to track her by accessing the shelter's security cameras, and returned to the church member's home.

[6] On June 11, 2014, the Indiana Department of Child Services ("DCS") received a report that Mother had unstable housing, had repeatedly moved, and would not leave the church member's home despite requests to do so; the report also indicated that J.H. had not been receiving services for his autism. Concerns about Mother's mental stability were also reported. During the subsequent investigation, DCS determined that Mother did not have stable housing, had little or no money, and was waiting for a school stipend to be able to care for J.H. Mother claimed to be the victim of domestic violence but declined to provide DCS with the name of her domestic violence counselor in Florida. Mother declined to return to the shelter due to her fear over the cameras and the lack of internet access, which she stated she needed to continue her employment as an internet writer. Mother also indicated her desire to return to Florida.

[7] On June 13, 2014, DCS filed a petition alleging that J.H. was a CHINS due to Mother's lack of stable housing, the failure to obtain services for J.H.'s autism,

and Mother's apparent mental health issues. DCS did not remove J.H. from Mother's care at that time, but that same day, the trial court entered an initial detention hearing at which it ordered J.H. to be placed with Father, who had come to Indiana. On June 17, 2014, the trial court denied Mother's request to place J.H. in her care and ordered DCS to file an expedited request to place J.H. with Father under the Interstate Compact on the Placement of Children ("ICPC"). The court also ordered J.H. to be placed in foster care if Father was unable to remain in Indiana. Although the trial court authorized the expedited ICPC placement with Father on June 23, 2014, Father returned to North Carolina, where he had been residing, and J.H. was placed in foster care. At some point in June 2014, Mother moved to Orange County, Indiana. For the first several months, she stayed at an extended-stay hotel but later moved into an apartment.

[8] During the CHINS proceedings, Mother admitted that J.H. was on the "autism spectrum" and had developmental delays in sensory processing, meaning that he is more sensitive to certain feelings and sounds. He had been in therapy since he was approximately eighteen months old and received services in Maryland and in Ohio. DCS recommended that J.H. receive physical and occupational therapy. Father reported that, since being removed from Mother's care, J.H. had improved. In Mother's care, J.H. was fed only baby food, due to concerns that he might choke, and drank from a sippy cup, but in Father's care, he had begun to eat more solid foods and drink from a straw and a water bottle.

[9] A fact-finding hearing was held on August 27, 2014. At this time, Mother had leased a three-bedroom apartment in Orange County, Indiana, and was working at a bar and continuing to work as an internet writer. Mother was consistent in her visitation with J.H. and was appropriately focused on his needs as an autistic child. Mother also consistently participated in the offered services. The trial court ordered J.H.'s guardian ad litem ("GAL") to visit and inspect Mother's home.

[10] At a placement hearing held on September 4, 2014, the trial court ordered DCS to refer Mother to services in Orange County, where she lived, and to place J.H. as close to Mother's home as possible. The trial court held additional fact-finding hearings on October 7 and December 10, 2014, and took the matter under advisement.

[11] On January 27, 2015, the trial court entered an order finding J.H. to be a CHINS, which found in relevant part:

> 21. [J.H.] needs stability and familiarity. [J.H.] also needs occupational therapy and physical therapy that he has not been consistently receiving due to his frequent moves. The only record of [Mother] seeking therapeutic services for [J.H.] occurred while they were living in Ohio. That provider indicated meeting with [Mother] only two times.
>
> 22. Both [Mother] and [Father]'s interactions with [J.H.] have been observed to be affectionate and appropriate.
>
> 23. [Mother] does not feel that she needs therapy as the distance she has placed between herself and [Father] and [Grandmother] have helped her situation. [Mother] believes that she has

provided stability for [J.H.] to the extent that she had a daily schedule for him as well as took him to the same stores. Additionally, [Mother] considers being in hotels as consistent and indicated that the child's first word was "room."

24. [Father] does not believe that he needs assistance as he has researched how to obtain services for [J.H.] in North Carolina.

25. [Mother] states concerns for [Father] due to his emotional abuse and threats. [Mother] has also made allegations of [Father] being domestically violent. [Father] states concerns for [Mother]'s mental health and stability.

26. [J.H.]'s physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent . . . to supply the child with necessary food, clothing, shelter, medical care, education, or supervision. Stability is particularly important for a child who has been determined to be on the autism spectrum in order to promote daily functioning and consistent therapy. [Mother] has failed to provide a stable environment for the child. She has moved a significant number of times in the past two years and has not established a stable routine for the child. [Father] has also failed to provide a stable environment for the child as he has not been [J.H.]'s primary caregiver for approximately two years with the exception of the month that he spent in Indianapolis under the order of this Court. Despite the actions of the parents and their stated reasons for these actions, the condition of [J.H.] is that he is a child who has been determined to be on the autism spectrum and who has not had consistent therapy for the past two years.

27. [J.H.] needs care, treatment, or rehabilitation that he is not receiving and is unlikely to be provided or accepted without coercive intervention of the court. [Mother] has stated that her original intention was to continue traveling with the child with the ultimate goal of moving to Florida. After the filing of the CHINS action, [Mother] has remained in [Orange County] for

approximately six months, which is seemingly one of the longest periods of stability she has had in over two years. The coercive intervention of this Court is needed to ensure that [J.H.] receives the consistent therapy that he requires.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that [J.H.] is a [CHINS].

Appellant's App. pp. 172-73.

[12] The court then held a dispositional hearing on February 17, 2015. At this hearing, DCS indicated that Mother was stable and that J.H. had been enrolled in appropriate educational programs. DCS requested that the trial court close the case; the GAL, previously unaware of DCS's plan to request that the case be closed, had no recommendation. The trial court ordered Mother to participate in home-based therapy and undergo a complete psychological evaluation. It also ordered in-home visitation. However, the trial court declined to close the case and ordered that J.H. remain in the custody of DCS and placed in foster care. The case goal remained reunification. Mother now appeals.

## I. Sufficiency of the Evidence

[13] Mother first claims that the trial court erred in finding J.H. to be a CHINS because the evidence was insufficient to establish that the coercion of the court was necessary for J.H. to receive services.

[14] Indiana Code section 31-34-1-1 provides that a child under eighteen years old is a CHINS if:

(1)  the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and;

(2)  the child needs care, treatment or rehabilitation that the child:

(A)  is not receiving; and

(B)  is unlikely to be provided or accepted without the coercive intervention of the court.

[15]  DCS has the burden of proving by a preponderance of the evidence that the child in question is a CHINS. *Perrine v. Marion Cnty. Office of Child Servs.*, 866 N.E.2d 269, 273 (Ind. Ct. App. 2007) (citing Ind. Code § 31-34-12-3). The trial court should consider the family's condition not only when the case was filed, but also when it is heard. *In re S.D.*, 2 N.E.3d 1283, 1290 (Ind. 2014), *reh'g denied*. When reviewing the sufficiency of evidence to support the trial court's CHINS determination on appeal, we consider only the evidence most favorable to the trial court's judgment and the reasonable inferences flowing therefrom. *Perrine*, 866 N.E.2d at 273. We do not reweigh the evidence or judge the credibility of witnesses. *Id.*

[16]  Here, Mother refers to the evidence indicating that she has adequate housing, is bonded and appropriately cares for J.H., and has fully cooperated with therapists and caseworkers to engage J.H. in services and treatment. Mother's home-based therapist indicated that she had no concerns for J.H.'s safety if he were to be placed in Mother's care and recommended that J.H. be placed with Mother. Even the DCS caseworker testified that she had no concerns with

placing J.H. with Mother. Indeed, DCS recommended that the CHINS case be closed.

[17] Still, Mother acknowledges that, in the past, she had inadequate housing and that J.H. was not receiving services. She blames this, however, on her fleeing from what she refers to as "domestic violence," though the record does not indicate that either Grandmother or Father were ever physically violent towards Mother or J.H. Mother's claims regarding Father and Grandmother, which they denied, did not have to be credited by the trial court. Indeed, given the concerns over Mother's paranoia, the trial court could reasonably conclude that Mother's claims were exaggerated, delusional, or a combination thereof.

[18] Mother still argues, however, that the conditions as they existed at the time of the CHINS hearing were insufficient to support keeping the CHINS case open. In this regard, Mother likens her situation to that before the Indiana Supreme Court in *In re S.D.*, *supra*.

[19] In that case, the child, S.D., suffered from a heart condition and was transferred from the family's home in northern Indiana to Riley Hospital in Indianapolis. At first, the mother stayed in Indianapolis with S.D. while the other children remained with relatives in Gary. However, when all the children moved to Indianapolis, the mother struggled to meet the family's needs—failing to enroll the children in school and spending less time with S.D. and attending to her needs. The mother then consented to DCS taking custody of the children. By the time of the CHINS fact-finding hearing, however, the mother had moved

into a three-bedroom home and renovated it adequately for the family to live in. The children other than S.D. had been returned to the mother's care. Although S.D. no longer required a ventilator, the hospital would not permit her to be released to her mother until she and another caregiver had completed "significant medical training" to care for S.D.'s tracheostomy at home. "However, [m]other struggled to find a second caregiver and had not finished the final step of the necessary medical training [and] had largely spurned DCS's help in identifying sources of social assistance and locating job opportunities." *Id*. at 1286. Instead, the mother relied on financial help from family, pursued a job lead she found on her own, and was still unemployed as of the hearing. *Id*.

[20] The trial court found S.D. to be a CHINS because no one in the home had completed the necessary medical training to meet S.D.'s special needs. *Id*. This court affirmed in an unpublished memorandum decision, and our supreme court granted transfer and held:

> Th[e] evidence, even viewed most favorably to the judgment, cannot reasonably support an inference that Mother was likely to need the court's coercive intervention to finish the home-care simulation. *A CHINS finding should consider the family's condition not just when the case was filed, but also when it is heard.* And here, Mother had resolved the issues involving S.D.'s siblings by the time of the hearing and completed all but the final step necessary for S.D.'s return home. Her approach to solving those problems was at times fitful or idiosyncratic—but it worked, as demonstrated by the siblings' return home weeks before the fact-finding hearing, and the court's eventual rejection of the CHINS allegations as to them. *And though the State's intervention enabled some of her progress, such as the ability to renovate the house while the*

*children were out of her care, none of the State's actions compelled her accomplishments.* Though the evidence shows she had difficulty completing the last step of medical training, we cannot say she was unwilling or unable to do so without the court's compulsion—and so the State's coercive intervention into the family cannot stand.

2 N.E.3d at 1290 (emphasis added) (citations omitted).

[21] In the present case, Mother claims that, as in *S.D.*, she too had improved her situation such that, by the time of the CHINS fact-finding hearing, the State's coercive intervention was not needed. Although this is admittedly a close call, we cannot say that the present case is on all fours with *S.D.*

[22] Here, Mother had made recent improvements, but, unlike the mother in *S.D.*, she had a history of frequently moving residences and housing instability, which adversely affected J.H.'s ability to receive treatment and services for his autism. Unlike in *S.D.*, here, the State's intervention does seem to have compelled Mother's accomplishments. Before DCS's intervention, Mother frequently moved, had no job, little money, and no stability with regard to housing. Indeed, she planned on moving to Florida again after spending a short time in Indiana. After DCS became involved, Mother secured employment and eventually adequate housing. Based on Mother's prior behavior, the trial court was within its discretion to believe that, absent its involvement, Mother might again revert to her prior behavior to the detriment of J.H. We therefore reject Mother's claim that DCS's involvement is what caused the "chaos" into J.H.'s life. To the contrary, there is every reason to believe that, absent DCS's

involvement, Mother would not have settled down and been able to improve her condition to the extent that she has now, admirably.

[23] Given the significant deference we give to trial court's in such matters, we cannot say that the trial court's decision not to close the CHINS case and to keep J.H. in the custody of DCS, with trial visitation for Mother, was clearly erroneous. Instead, the evidence favorable to the trial court's decision shows that J.H.'s mental condition was seriously impaired or endangered by Mother's inability or refusal to supply him with the necessary medical care and that J.H. needs care and treatment that he was not receiving and was unlikely to receive without the coercive intervention of the trial court. Accordingly, we affirm the trial court's CHINS finding and dispositional decree.

## II. Improper Grounds for Trial Court's Decision

[24] Mother also contends that the trial court's dispositional decree, in which J.H. was ordered to remain a ward of DCS and Mother ordered to complete services, was improper because DCS recommended that the case be closed and because the trial court's true goal was simply to facilitate a visitation schedule between Mother and Father.

[25] First, to the extent that Mother claims that the trial court's order was improper simply because DCS recommended that the case be closed, we disagree. The trial court has the ultimate authority to decide the CHINS case.

[26] Further, we disagree with Mother that the trial court kept the CHINS case open and issued its dispositional decree simply to facilitate visitation. As Mother

admits, the issue of visitation is not mentioned in the trial court's dispositional order being appealed. Mother instead points to an extended discussion the parties had at the end of the fact-finding hearing regarding the issue of visitation. *See* Tr. pp. 373, 379-85. Simply because the trial court discussed the issue of visitation, and the concurrent paternity action, does not mean that the trial court based its dispositional decree on a desire to facilitate visitation. As noted above, evidence was sufficient to support the trial court's CHINS finding and dispositional decree. The discussion of visitation with Father does not alter this or vitiate the validity of the trial court's order.

[27] Affirmed.

Bailey, J., concurs.

Baker, J., dissents with opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

In Re J.H. (Minor Child), Child in Need of Services,

and

E.H. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

Court of Appeals Case No.
49A02-1503-JC-158

**Baker, Judge, dissenting.**

[1] I respectfully dissent. In this case, Mother had led an unstable life during the years leading to the filing of the CHINS petition. She and J.H. had lived in multiple residences in multiple states. During that time, she made an effort to ensure that J.H. received the services that he needed but did not always succeed. Mother may have also had some mental health issues.

[2] As a result of those circumstances, DCS filed a CHINS petition in June 2014. The factfinding was not completed until December 2014. During those six months, Mother participated voluntarily in multiple services, including home-based therapy and individual therapy. She fully cooperated with all service

providers, even driving repeatedly to Marion County when she was living in Orange County to participate with services and visits until DCS transferred her services to her home county. By the time of the completion of the factfinding hearing, Mother's home-based therapist had no safety concerns and recommended placement of J.H. with Mother; Mother's individual therapist had observed many positive interactions between Mother and J.H. and had no safety concerns; and the DCS case manager had no safety concerns. Mother also agreed to enroll J.H. in a preschool program and therapy recommended by DCS. Additionally, Mother had signed a lease for an appropriate three-bedroom home and had been living there for four months at the time the factfinding hearing was completed.

[3]     In sum, Mother needed some help to achieve stability in her life. She welcomed and received the assistance provided by DCS. And by the time of the completion of factfinding, she had achieved stability. The system worked. There is simply no evidence in the record that, at the time of the factfinding hearing, the coercive intervention of the court was necessary or that J.H. was in any way endangered in Mother's care. In my view, therefore, the juvenile court erred by finding J.H. to be a CHINS.

[4]     Furthermore, and in my opinion even more egregiously, the juvenile court erred by proceeding to disposition on Mother and J.H. following the CHINS adjudication. At the dispositional hearing, all service providers and DCS recommended successful case closure. No one voiced a single safety concern. Notwithstanding this reality, the juvenile court ordered that J.H. remain a ward

of DCS and ordered Mother to participate in services—services that the providers themselves had declared to be unnecessary. From the record, it is evident that the reason the juvenile court took this course was to enable Mother and J.H.'s father to reach a visitation arrangement. This is an entirely inappropriate reason to declare that a child must remain a ward of the State and order a parent to participate in services.

[5] In my opinion, the juvenile court erred twice—first, by adjudicating J.H. to be a CHINS, and second, by proceeding to disposition in the face of the recommendation of DCS and all service providers that the case be closed successfully. Therefore, I respectfully dissent from the majority as I believe we should reverse.